[No. B064243. Second Dist., Div. Five. Dec. 23, 1994.]

GARY LEHTO, Plaintiff and Appellant, v.
ALLSTATE INSURANCE COMPANY, Defendant and Appellant.

**COUNSEL**

Watkins & Stevens, Steven B. Stevens, Mazursky, Schwartz & Angelo and Christopher E. Angelo for Plaintiff and Appellant.

Crosby, Heafey, Roach & May, James C. Martin, Kathy M. Banke and Timothy P. O'Toole for Defendant and Appellant.

**OPINION**

**ARMSTRONG, J.**—In this insurance bad faith suit, defendant Allstate Insurance Company appeals the judgment entered following a jury's verdict

in favor of plaintiff Gary Lehto. Prior to the instant action, Allstate's insureds, Israel and Raul Carbajal, entered into a stipulated judgment in the amount of $2.6 million in favor of plaintiff, in exchange for a covenant not to execute and an assignment of the Carbajals' bad faith claims against Allstate. The jury awarded plaintiff $2.5 million in compensatory damages based on the Carbajals' bad faith claims, and $1 million in compensatory damages for plaintiff's bad faith action based on breach of Insurance Code section 790.03, subdivision (h). The trial court granted Allstate a nonsuit with respect to plaintiff's claims for punitive damages, a holding which plaintiff challenges on appeal. Plaintiff also appeals the trial court's post-judgment order denying his request that Allstate pay interest on the stipulated judgment from the date of its entry. Finally, both parties appeal various evidentiary and instructional rulings of the trial court.

## FACTS

In May 1980, Raul Carbajal, the teenage son of Allstate's insured, Israel Carbajal, was involved in a head-on collision with another vehicle, in which five people were injured. Plaintiff was the most seriously hurt, suffering permanently disabling injuries. As a result of its preliminary investigation of the accident, Allstate concluded that Raul was at fault, since he had crossed the center line (although it was unclear whether Raul had fallen asleep or was intoxicated).[1] The Carbajals' insurance policy provided limits of $25,000 per person and $50,000 per accident, while plaintiff's medical bills quickly exceeded those limits. The Carbajals had no assets from which to satisfy a judgment other than their Allstate policy.

Shortly after the accident, plaintiff's attorney, Ronald Dean, asked to interview Raul Carbajal. In response to that request, Allstate referred the matter to the law firm of Hiestand & Brandt, who recommended that the Carbajals not give statements to plaintiff's counsel. By July 1980, both Allstate and Hiestand & Brandt had discovered that Raul had a number of moving violations, suggesting that Israel might be separately liable to plaintiff on a negligent entrustment theory.

In July 1980, Allstate filed an interpleader action in order to apportion the policy limits among the five claimants, depositing the $50,000 policy limits with the court. The interpleader, filed on Allstate's behalf by the Hiestand firm, named the five claimants as well as the Carbajals as defendants.

On September 15, 1980, attorney Hiestand reported to Allstate that plaintiff intended to seek $2 million in damages from Israel and Raul. Plaintiff

---

[1] It was later revealed that Raul's blood-alcohol level at the time of the accident was in excess of 0.11.

filed suit on October 3, 1980, naming Israel, Raul, Raul's three passengers, the City of Oxnard and the State of California as defendants. Allstate authorized Hiestand to appear on behalf of Israel and Raul in the newly filed lawsuit.

Throughout 1981, plaintiff consistently maintained that he had no intention of accepting the per claimant policy limits through the interpleader if it would result in the dismissal of the Carbajals from the personal injury action. Plaintiff's attorney, Dean, reiterated this position the following month, saying that he would "not accept the $25,000 in full settlement of all claims . . . as my client's damages easily exceed $2.5 million." Dean went on to insist that plaintiff was entitled to immediate payment of the policy limits without a release, as "mitigation" and "partial payment" of his damages. In response to Dean's demands, Hiestand stated that Allstate was not required to fund plaintiff's lawsuit against Israel and Raul, and repeatedly told Dean that Allstate would not pay the limits without a release of the Carbajals.

In mid-1981, the five claimants, including plaintiff, reached an agreement regarding apportionment of the policy proceeds, and Allstate filed a motion in the interpleader action to distribute the funds.[2] The interpleader court required the settling claimants to release the Carbajals as a condition of obtaining their share of the policy proceeds. Because plaintiff refused to release the Carbajals, the court ordered that plaintiff's share of the proceeds be held by the court pending resolution of plaintiff's personal injury lawsuit. Throughout this time, Allstate's counsel advised it to refuse plaintiff's demand to pay the policy limits without a release, notwithstanding Dean's continuing accusations of bad faith.

On February 27, 1982, plaintiff made a new settlement proposal: He would release Israel, but not Raul, in exchange for the $25,000 policy limits. Upon learning of this proposal, Hiestand told the Carbajals that it was "illegal." Not surprisingly, based on their counsel's advice, the Carbajals were adamantly opposed to the offer, with Israel refusing to allow his son's interests to be sacrificed so that he could get out of the lawsuit. Hiestand communicated the Carbajals' sentiments to Allstate.

Allstate's counsel, Conway, in turn responded to plaintiff's offer, stating that Allstate owed an equal duty to each of its insureds and that Allstate would not agree to a settlement that would leave one of its insureds bereft of coverage and fund the litigation against him. Conway also advised Allstate

---

[2]At Hiestand's urging, Allstate retained new counsel, the firm of Mavradis & Conway, to represent it in the interpleader action.

that if it accepted the offer, Raul would undoubtedly file a bad faith action against the insurer.

In reply to Allstate's rejection of his "Israel only" proposal, Dean noted that the proposed settlement entailed no conceivable detriment to Raul since he would continue to receive a defense and would get a $25,000 credit against any damages awarded in plaintiff's case.

Conway disagreed with Dean's assessment, reasoning that, without a release, plaintiff's tort action would proceed to trial against Raul alone, with the possibility of a large judgment against him. Conway reiterated to Allstate that it could not protect one insured at the expense of the other without incurring liability for bad faith. Due to the impasse, Conway recommended that Allstate file a declaratory relief action, seeking a determination of the parties' respective rights and obligations in the face of plaintiff's "Israel only" offer.

That action was filed in November of 1982.[3] Although plaintiff had in the past argued that he was entitled to immediate and unconditional payment of the policy limits, he demurred on the ground that the declaratory relief action was premature since plaintiff's tort suit against the Carbajals had not yet been resolved. The trial court agreed and dismissed the action without prejudice.

Plaintiff's case against the Carbajals was inactive while plaintiff pursued an appeal against the City of Oxnard, which had successfully demurred to plaintiff's complaint.[4] When activity on the case resumed, and after a pretrial motion to exclude Raul's driving record was denied in March 1987, Hiestand & Brandt advised Allstate that it was discussing settlement of plaintiff's claims against the Carbajals by way of a stipulated judgment with a covenant not to execute and an assignment of the insureds' bad faith claims. On June 29, 1988, the parties entered into such a settlement, which included a $2,635,000 stipulated judgment, as well as a finding that the Carbajals were 95 percent at fault for plaintiff's injuries.

On April 8, 1988, plaintiff filed this bad faith action, seeking $2.5 million in damages on the Carbajals' assigned claims against Allstate, plus additional compensatory and punitive damages based on Allstate's breach of

---

[3]Allstate delayed filing the declaratory relief action at plaintiff's request. Plaintiff indicated that he would release both of the Carbajals if he were satisfied that Raul's passengers' testimony would support plaintiff's claims against the City of Oxnard and the state. Dean was apparently not so satisfied, since he later notified Conway that he could proceed with the declaratory relief action.

[4]During this time, Allstate agreed to waive the five-year statute.

Insurance Code section 790.03, subdivision (h) by, among other things, not attempting in good faith to effectuate prompt, fair, and equitable settlement of plaintiff's claim when liability had become reasonably clear.[5]

The case proceeded to trial in July 1991. Plaintiff argued that Allstate committed multiple acts of bad faith in handling plaintiff's claims against the Carbajals. The jury agreed with plaintiff's assessment, awarding $2.5 million in damages on the assigned claims of Israel and Raul,[6] and an additional $1 million on plaintiff's "Royal Globe" claim. The trial court had granted a nonsuit in Allstate's favor as to plaintiff's claim for punitive damages; thus no such damages were awarded.

Subsequent to rendition of the verdict, plaintiff submitted a proposed judgment to the court that included $804,357 in interest on the stipulated judgment entered into between plaintiff and the Carbajals. Allstate opposed the proposed judgment and, after a hearing on the matter, the trial court denied plaintiff's request for interest on the stipulated judgment. The trial court also denied Allstate's motions for new trial and for judgment notwithstanding the verdict.

## DISCUSSION

Plaintiff, as assignee of the Carbajals' claims against Allstate, sued Allstate for bad faith refusal to settle the personal injury action filed against them by plaintiff. ■ The basis of such a bad faith suit has been explained as follows: " ' "[I]n every contract there is an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement" [citation], that this principle is applicable to insurance policies, and that "the implied obligation of good faith and fair dealing requires the insurer to settle in an appropriate case although the express terms of the policy do not impose such a duty" [citation]. [¶] More specifically, the insurer must settle within policy limits when there is substantial likelihood of recovery in excess of those limits. [Citations.]' If the insurer breaches the duty to settle, the insurer is liable to the insured for the consequences of the breach." (*Purdy* v. *Pacific Automobile Ins. Co.* (1984) 157 Cal.App.3d 59, 71 [203 Cal.Rptr. 524],

---

[5]The Supreme Court created this latter cause of action, for an insurance company's breach of duty to the claimant under its insured's policy, in *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880 [153 Cal.Rptr. 842, 592 P.2d 329], and eliminated the action in *Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287 [250 Cal.Rptr. 116, 758 P.2d 58]. However, the latter decision is to be applied prospectively only. The Supreme Court issued its opinion in *Moradi-Shalal* on August 18, 1988, four months after plaintiff filed this lawsuit.

[6]However, the jury found that Raul suffered no damages as a result of Allstate's bad faith.

quoting *Murphy* v. *Allstate Ins. Co.* (1976) 17 Cal.3d 937, 940-941 [132 Cal.Rptr. 424, 553 P.2d 584]; see also *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 659 [328 P.2d 198, 68 A.L.R.2d 883]; *Walbrook Ins. Co.* v. *Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1459 [7 Cal.Rptr.2d 513].) The consequence of this breach of the duty of good faith and fair dealing is the insurer's liability for the entire amount of the judgment recovered against the insured, including the amount in excess of the policy limits. (*Comunale* v. *Traders & General Ins. Co.*, *supra*, 50 Cal.2d at p. 600; *Walbrook Ins. Co.* v. *Liberty Mutual Ins. Co.*, *supra*, 5 Cal.App.4th at pp. 1453-1454.) Because Allstate's preliminary investigation disclosed that both Israel and Raul Carbajal were exposed to liability in excess of the limits of their insurance policy, Allstate's duty to attempt to settle plaintiff's suit against them within those limits was immediately implicated.

Allstate contends that, as a matter of law, bad faith liability cannot be predicated on any of the following actions which plaintiff cites as instances of Allstate's bad faith: (1) failing to offer plaintiff the $15,000 limits of vicarious owner liability under Vehicle Code section 17150 et seq.; (2) filing an interpleader action; (3) mishandling a conflict of interest between Israel and Raul; and (4) rejecting plaintiff's "Israel only" proposal because it did not include a complete release of all insureds. We consider each of these contentions in turn.

### 1. *Liability based on the Vehicle Code*

Vehicle Code section 17150 provides that an owner of a motor vehicle is liable for the negligent or wrongful acts or omissions of any person using the vehicle with the owner's permission. Vehicle Code section 17151, subdivision (a) limits the owner's vicarious liability to $15,000 per person and $30,000 per accident. ■ Plaintiff argued to the jury that Allstate's failure to offer $15,000 on behalf of Israel Carbajal in satisfaction of his Vehicle Code section 17150 liability constituted bad faith.

The record does not support a finding of bad faith premised on Israel's vicarious liability under the Vehicle Code. Rather, the evidence established that upon completion of its investigation, Allstate offered to settle with all claimants for the Carbajals' policy limits of $25,000 per person and $50,000 per accident. The fact that, if Raul were found at fault, Israel would be liable to plaintiff for $15,000 under the Vehicle Code, does not increase the policy limits. Upon determining that its insureds' liability, under Vehicle Code section 17150 or otherwise, was reasonably clear, Allstate offered the limits of its policy. This is precisely what an insurer is required to do.

## 2. *Liability based on Allstate's filing of interpleader action*

■ Plaintiff also theorized that Allstate's conduct in filing and prosecuting the interpleader action constituted bad faith, relying on *National Life & Accident Ins. Co.* v. *Edwards* (1981) 119 Cal.App.3d 326 [174 Cal.Rptr. 31] and *Kelly* v. *Farmers Ins. Exchange* (1987) 194 Cal.App.3d 1 [239 Cal.Rptr. 259].

In *National Life, supra,* a decedent's aunt and estranged wife both claimed the right to benefits under a life insurance policy. The carrier interpleaded the funds and the claimants cross-claimed for breach of the implied covenant of good faith and fair dealing. The appellate court stated that " '[T]he filing of an interpleader or payment into court by the insurer can be construed only as a recognition of liability to the rightful claimant and as a measure taken to protect the insurer against a double liability.' (*Pimentel* v. *Conselho Supremo etc.* (1936) 6 Cal.2d 182, 186 [57 P.2d 131].)" (*National Life & Accident Ins. Co.* v. *Edwards, supra,* 119 Cal.App.3d at p. 340.) It recognized, however, that the filing of an interpleader action will not sanitize a claim that is being prosecuted in bad faith. It concluded: "A bad faith action cannot be predicated upon National filing an interpleader unless there was a showing that the claims of the interpleading parties were not asserted in good faith." (*Ibid.*)

Here, as in *National Life,* multiple claims were asserted against the proceeds of the insureds' policy. The interpleader was thus properly filed to apportion the policy proceeds among the competing claimants. While the filing of the interpleader action would not absolve Allstate of liability had it refused in bad faith to offer the policy limits to the Carbajals' claimants, the filing of the interpleader, standing alone, cannot itself constitute an act of bad faith.

*Kelly* v. *Farmers Ins. Exchange, supra,* 194 Cal.App.3d 1 does not hold otherwise. There, Kelly was injured when he was struck by an automobile owned and operated by an uninsured driver. A passenger in that car was giving driving lessons to the owner/driver. Kelly sustained injuries in excess of $45,000. Kelly received $15,000 in uninsured motorist benefits from United Pacific, his employer's insurer. He then filed a claim against the passenger/instructor and her carrier, Farmers, for the policy limits of $25,000. Farmers offered to settle for policy limits provided that United Pacific release any claim or right of subrogation based on its uninsured motorist payments to Kelly. When United Pacific refused to do so, Kelly demanded that Farmers settle for the policy limits despite United's subrogation claim, an offer Farmers continued to decline. (*Kelly* v. *Farmers Ins. Exchange, supra,* 194 Cal.App.3d at pp. 4-5.)

Farmers then filed an interpleader action to resolve the competing claims to the policy. The interpleader concluded with a finding that Kelly would not be fully compensated for his damages by both insurance policies, and that he was therefore entitled to the full amount of the Farmers policy limits. Farmers then offered to settle Kelly's claims against Farmers's insured for the $25,000 policy limits, without conditions, which offer Kelly refused. (194 Cal.App.3d at p. 5.)

After recovering a $158,000 judgment against Farmers's insured, Kelly sued Farmers for bad faith breach of Insurance Code section 790.03. Summary judgment was entered in favor of Farmers, which maintained that an insurer's obligation of good faith and fair dealing precludes it from paying its policy limits for a settlement that does not dispose of all claims against its insured. (194 Cal.App.3d at p. 5.)

The Court of Appeal reversed. It held that in reality Farmers was faced with only one claimant for the policy limits, since two prior decisions of the Court of Appeal[7] had determined that uninsured motorist carriers in United Pacific's position have no subrogation rights against the insured tortfeasor. Thus, the court reasoned that a triable issue of fact existed as to whether Farmers's refusal to pay the policy limits unless United released its non-existent claim constituted an unfair settlement practice. (194 Cal.App.3d at pp. 7-10.)

*Kelly* provides no support for plaintiff's argument. As noted, the act of bad faith, if indeed the trier of fact determined that Farmers violated its duties,[8] was to refuse to settle plaintiff's bona fide claim for the policy limits in settlement of his lawsuit when in fact there were no other persons with valid claims to the proceeds. This comports with our holding that filing of an interpleader action alone will not subject an insurer to bad faith liability. While such a filing will not insulate the insurer's actions from claims of bad faith, it was Farmers's conduct in refusing Kelly's bona fide claim to the policy proceeds, in the absence of valid, competing claims against the policy, which could subject it to liability. This situation is readily distinguishable from that of Allstate, which faced multiple bona fide claims against the Carbajals' limited policy.

---

[7]*Security Nat. Ins. Co.* v. *Hand* (1973) 31 Cal.App.3d 227 [107 Cal.Rptr. 439] and *California State Auto. Assn. Inter-Ins. Bureau* v. *Huddleston* (1977) 68 Cal.App.3d 1061 [137 Cal.Rptr. 690] hold that the right of subrogation granted to the uninsured motorist carrier by the Insurance Code does not grant the carrier the right to recover the money paid out to its insured for the personal injuries suffered by its injured insured from the insured tortfeasor's company, unless and until its own injured insured is fully compensated for his damages.

[8]As the Court of Appeal in *Twaite* v. *Allstate Ins. Co.* (1989) 216 Cal.App.3d 239 [264 Cal.Rptr. 598] observed, the *Kelly* court articulated no standard against which to measure the insurer's conduct. (*Id.* at p. 255.)

As to plaintiff's claim that Allstate filed the interpleader in order to decrease its defense costs: While a successful interpleader action will inexorably result in reduced defense costs, this does not render resort to the procedure an act of bad faith. In fact, the interpleader action here had the intended result: It awarded plaintiff, the most seriously injured of the claimants, the $25,000 per person limit under the policy. Plaintiff chose to litigate his tort claims against the Carbajals rather than accept the policy limits in settlement of those claims, as was his right. That does not change the fact that Allstate's use of the interpleader action in this case was perfectly proper: It provided a judicially supervised forum for the collective resolution of all competing claims, the very purpose of interpleader. (*Hancock Oil Co.* v. *Hopkins* (1944) 24 Cal.2d 497, 508 [150 P.2d 463]; *Cantu* v. *Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 873-874 [6 Cal.Rptr.2d 151].)

3. *Liability based on Allstate's failure to appoint separate counsel for Israel and Raul and rejection of the "Israel only" offer*

Next, plaintiff maintains that Allstate's failure to appoint separate counsel for its insureds constituted bad faith.

Initially we note that, plaintiff's argument to the contrary notwithstanding, there was no conflict of interest between Allstate and its insureds. "[A] conflict of interest arises between insurer and insured when a third party claim is made in excess of the policy limits. In such a situation, it will always be to the insured's advantage to have settlement effected within policy limits; the insurer, in deciding whether to compromise a claim, must consider the insured's best interests as much as its own." (*Barney* v. *Aetna Casualty & Surety Co.* (1986) 185 Cal.App.3d 966, 976 [230 Cal.Rptr. 215].) Where, as here, the insurer early on decides to offer the policy limits in settlement of its insureds' claims, no conflict of interest arises.

As to the purported conflict of interest between Israel and Raul, Allstate correctly notes that, so long as there existed only a potential conflict of interest between its two insureds, it was not required to retain separate counsel for father and son. (*Spindle* v. *Chubb/Pacific Indemnity Group* (1979) 89 Cal.App.3d 706, 713 [152 Cal.Rptr. 776].) Thus, from the time of the accident until February 1982, when plaintiff made his "Israel only" offer, the interests of Israel and Raul, while potentially adverse, were not in actual conflict. Moreover, Allstate had committed no bad faith in refusing to settle the case within the policy limits of both of its insureds, since plaintiff refused to consider any settlement offer which included a release of Israel and Raul. (See, e.g., *Merritt* v. *Reserve Ins. Co.* (1973) 34 Cal.App.3d 858,

879 [110 Cal.Rptr. 511] [no evidence that injured party would accept a settlement within policy limits].) However, according to plaintiff, the situation changed dramatically when plaintiff offered to release Israel alone in exchange for the $25,000 policy limits. At that point, Allstate was presented with an opportunity to settle plaintiff's claim against Israel, which potentially far exceeded his insurance coverage, for an amount within the limits of his policy. Thus, Allstate first had the ability to settle on behalf of one of its insureds within the policy limits when the "Israel only" offer was made. Plaintiff argues that, at that point in time, Allstate was duty bound to appoint separate counsel for Raul, since an inherent conflict of interest between Israel and Raul was created when plaintiff proposed to release Israel alone in exchange for the remaining policy proceeds.[9]

While plaintiff frames the issue in terms of a purported conflict of interest between the two insureds, we believe the real question before us is whether Allstate's insistence on a release of both of its insureds constituted bad faith. We conclude that, in this case, it did not.

For a year and a half, plaintiff steadfastly refused Allstate's offer to pay him the policy proceeds in return for a release of the Carbajals. The interpleader action, too, resulted in an award to plaintiff of the $25,000 policy benefits conditioned on a release of the Carbajals, an award plaintiff rejected. Then, in February 1982, plaintiff proposed a new settlement: The release of Israel alone in return for the policy limits. Allstate continued to insist that it would pay the policy limits to plaintiff only upon the release of both of its insureds. Plaintiff contends that Allstate's insistence on this condition was in bad faith.

An insurer owes the duty of good faith and fair dealing to each of its insureds, and cannot favor the interests of one insured over the other. (*Strauss* v. *Farmers Ins. Exchange* (1994) 26 Cal.App.4th 1017, 1021 [31 Cal.Rptr.2d 811] [review den.].) Moreover, an insurer can breach its duty to its insureds by disbursing the policy proceeds to the insureds' claimant without first obtaining a release of the insureds. (*Ibid.*; see also *State Farm Mut. Auto. Ins. Co.* v. *Crane* (1990) 217 Cal.App.3d 1127, 1136 [266 Cal.Rptr. 422]; *Palmer* v. *Financial Indem. Co.* (1963) 215 Cal.App.2d 419, 431 [30 Cal.Rptr. 204]; *Merritt* v. *Reserve Ins. Co.*, *supra*, 34 Cal.App.3d at p. 871.) We know of no case permitting an insured, or his assignee or

---

[9]We do not address the issue of whether Allstate was required to appoint separate counsel for Israel and Raul in this case, since even had it done so, Allstate's conundrum would not have been resolved. For even had Israel received the advice of counsel loyal to him alone and demanded that Allstate accept the "Israel only" offer in return for his dismissal from the case, Allstate could not have accepted that offer without prejudicing Raul, as we discuss below.

claimant, to sue for bad faith on the basis of the insurer's rejection of a settlement demand because it did not include a complete release of the insured. (Cf. *Strauss* v. *Farmers Ins. Exchange, supra,* 26 Cal.App.4th at pp. 1021-1022; *State Farm Mut. Auto. Ins. Co.* v. *Crane, supra,* 217 Cal.App.3d 1127, 1135-1136; *Coe* v. *State Farm Mut. Auto. Ins. Co.* (1977) 66 Cal.App.3d 981, 994 [136 Cal.Rptr. 331].) And we decline to create such liability, for by offering the policy limits in exchange for a release, the insurer has done all within its power to effect a settlement. Judge Posner explained the rationale behind this conclusion in *Steele* v. *Hartford Fire Ins. Co.* (7th Cir. 1986) 788 F.2d 441: "[The insurance company] demonstrated good faith in the ordinary sense of these words by protecting the insured's interests at the expense of [its own] . . . h[anging] around . . . vainly trying . . . to obtain a release from [plaintiff] . . . . We do not suggest that this was altruism, for we know what would have happened if the company had settled [without a release: the insurer would have been accused of bad faith]. It seems, then, that whatever [the agent] did he would be exposing the [insurer] to a claim of bad faith. It cannot be the law that every excess judgment must be paid by the insurance company, so that in effect liability insurance policies have no limits. Such a strange result would not even help policyholders in the long run; insurance companies would have to charge much higher prices, especially for policies with low limits." (*Id.* at p. 447.)

Plaintiff's contention that he should be able to release one insured in return for the policy limits while maintaining his tort action against the other insured is contrary to sound public policy. First, it would permit the claimant to inject himself into the insurance relationship, and to direct the insurer to favor one insured over the other. Thus, the claimant would determine which insured would receive the full benefits of the insurance policy. Such a result can hardly be said to be within the reasonable expectations of the insured. Secondly, sanctioning this power of the claimant would necessarily introduce the issue of the relative wealth of the insureds into the equation. For implicit in plaintiff's argument that Raul would not be prejudiced by Allstate's acceptance of the "Israel only" offer is the notion that Raul had no assets, and thus would not as a practical matter be harmed by the entry of an adverse judgment.

This latter point is particularly troublesome. First, we cannot blithely dismiss, as plaintiff's argument does, the emotional toll that a personal injury trial exacts upon the parties. It is simply not true to state that Israel would not have received greater benefits under the insurance contract, and that Raul would have received all he was entitled to pursuant to the policy, had Allstate accepted the "Israel only" offer, since Raul would thereby necessarily lose all prospects for settlement and be forced to proceed to

trial.[10] More importantly, plaintiff's argument suggests that the relative wealth of multiple insureds should be taken into account by the insurer when considering offers of settlement, and that only a "judgment proof" insured may be forced to remain in a lawsuit if the claimant demands the policy limits for a release of the other insured. The law does not condone such discrimination. (See *Strauss* v. *Farmers Ins. Exchange, supra,* 26 Cal.App.4th 1017, 1021; *Heredia* v. *Farmers Ins. Exchange* (1991) 228 Cal.App.3d 1345, 1357 [279 Cal.Rptr. 511]; *Coe* v. *State Farm Mut. Auto. Ins. Co., supra,* 66 Cal.App.3d at p. 994.)

Finally, an insurer's obligation to satisfy claims under third party liability insurance is premised on the legal liability of the insured.[11] That liability does not arise at the time the injuries are sustained. Rather, the insurer's legal obligation to pay the injured party is created either voluntarily, by agreement of the parties, or involuntarily, by entry of judgment. That is to say, "[an] insurer is authorized to settle lawsuits, not to pay unilaterally the policy limits to a plaintiff. Moreover, it is generally recognized that such an unconditional payment, which has the effect of bankrolling a plaintiff's case against the insured, is not made in good faith. [Citations.]" (*State Farm Mut. Auto. Ins. Co.* v. *Crane, supra,* 217 Cal.App.3d at p. 1136.)

As the Court of Appeal held in *Coe* v. *State Farm Mut. Auto. Ins. Co., supra,* 66 Cal.App.3d 981, "[A]cceptance by [the insurer] of the 'offer,' as made, would have amounted to an abdication of its responsibilities to its own insured. Specifically, it would have breached its 'implied covenant of good faith and fair dealing' not to 'injure [the insured's] rights under [the] policy [citation], and its obligation 'to consider the interests of the assured equally with its own.' [Citation.] Bad faith refusal to accept a settlement offer cannot occur where 'acceptance' would itself be bad faith." (*Id.* at p. 994.) "As [the insurer] would have acted in bad faith by accepting the offer,

---

[10]Plaintiff cites *Nationwide Ins. Co.* v. *Hunley* (9th Cir. 1990) 915 F.2d 557 in support of his assertion that Raul would have received all of the benefits of the insurance contract had Allstate accepted the "Israel only" offer. Plaintiff's reliance on that case is misplaced. In *Hunley,* the Ninth Circuit Court of Appeals was required to determine whether California Insurance Code section 11580.1, subdivision (b)(4), which requires that car insurance policies insure permissive users "to the same extent that insurance is provided to the named insured," had been satisfied in the particular circumstances of that case. The court held that, where the named insured is released in return for the policy proceeds, the insurer must continue to defend the permissive user, but need not separately indemnify him up to the policy limits for any subsequent judgment, in order to comply with provisions of the Insurance Code. The court was not called upon to decide whether the insurer's conduct in effecting the settlement of the claim against the named insured was in bad faith.

[11]The Carbajals' insurance policy provided that "Allstate will pay for all damages a person insured is legally obligated to pay . . . ."

it could not be held in bad faith for refusing it." (*Strauss* v. *Farmers Ins. Exchange, supra,* 26 Cal.App.4th at p. 1022.)[12]

Such is the case here. Were Allstate to accept plaintiff's "Israel only" offer, it would have left one of its insureds bereft of coverage, an act of bad faith. (*Strauss* v. *Farmers Ins. Exchange, supra,* 26 Cal.App.4th at pp. 1021-1022; see also *Palmer* v. *Financial Indem. Co., supra,* 215 Cal.App.2d at p. 431; *Heredia* v. *Farmers Ins. Exchange, supra,* 228 Cal.App.3d at p. 1355; *Coe* v. *State Farm Mut. Auto. Ins. Co., supra,* 66 Cal.App.3d at p. 994.) Allstate's failure to do so cannot itself be deemed to be bad faith.

We concur with the *Strauss* court's apt description of the insurer's position as a "Catch-22." "If we were to agree with [plaintiff's] reasoning, an insurer would be liable for either agreeing to or refusing to settle. This dilemma would discourage settlements and defy the reasonable expectations of the insureds." (*Strauss* v. *Farmers Ins. Exchange, supra,* 26 Cal.App.4th at p. 1022.) Indeed, we think it likely that few plaintiffs would settle a tort action in which two insureds were entitled to benefits under the same insurance policy, since the plaintiffs could receive the policy limits in exchange for the release of one insured, but continue the litigation against the other. This result is completely counter to California's strong public policy in favor of settlement. (*Neary* v. *Regents of University of California* (1992) 3 Cal.4th 273, 277 [10 Cal.Rptr.2d 859, 834 P.2d 119]; *Bush* v. *Superior Court* (1992) 10 Cal.App.4th 1374, 1382 [13 Cal.Rptr.2d 382].)

---

[12]Plaintiff suggests that the holding of *Strauss* v. *Farmers Ins. Exchange, supra,* is in doubt due to the recent decision of the Court of Appeal in *Hartford Casualty Ins. Co.* v. *Mid-Century Ins. Co.* (1994) 26 Cal.App.4th 1783 [32 Cal.Rptr.2d 351]. We disagree. *Hartford* involved an excess insurer's equitable indemnity action, in which it sought indemnity against the primary insurer for settlement and defense costs incurred in the underlying personal injury action. The primary insurer, Mid-Century, had settled the injured party's claim against the owner/named insured for $15,000, the limits of the owner's liability under Vehicle Code section 17151, subdivision (a), and the limits of the insurance policy. Mid-Century thereafter refused to defend or indemnify the permissive user, relying on the policy language which provided that the insurer would not defend any suit or make additional payments after it had paid the "limit of liability for the coverage," and that it would pay no more than the maximum limits provided by the policy regardless of the number of insured persons involved in the accident. Interpreting the language of the insurance policy, the Court of Appeal held that Mid-Century had fulfilled its duty by defending and settling for $15,000 on behalf of its own named insured, and that the obligation of further defense and indemnity properly fell on the excess insurer.

*Hartford* is inapposite since it did not involve claims of bad faith. Moreover, Mid-Century's settlement on behalf of the owner obviously did not leave its other insured, the permissive user, bereft of coverage. Additional coverage was provided by the excess policy with Hartford.

#### 4. *Liability based on stipulated judgment*

■ Finally, plaintiff argues that the jury's verdict may be premised on Allstate's conduct in stipulating to entry of a judgment against its insureds without their consent. This argument lacks merit.

Plaintiff provides no citations to the record to support his contention that this theory of recovery was pleaded and proved at trial. Moreover, the record contains two documents, one entitled "Assignment of Action" and the other entitled "Stipulation for Entry of Judgment," both of which are apparently signed by the Carbajals and both of which contemplate entry of a stipulated judgment. Lastly, the stipulated judgment itself was signed by the Carbajals' attorney. If that attorney was not authorized to enter into the stipulated judgment, the Carbajals' remedy lies against the attorney who committed the unauthorized act, and not with Allstate, who at most agreed to be bound by the stipulated judgment.

Based on the foregoing, we can discern no basis for the jury's award of damages premised on Allstate's conduct in stipulating to entry of a judgment without the Carbajals' consent.[13]

### DISPOSITION

Because Allstate's conduct in handling plaintiff's claim on behalf of its insured did not constitute bad faith as a matter of law, the trial court erred in denying Allstate's motion for judgment notwithstanding the verdict. Accordingly, the judgment is reversed, and the trial court is directed to enter judgment for Allstate.[14] The parties are to bear their own costs on appeal.

Grignon, Acting P. J., and Godoy Perez, J., concurred.

A petition for a rehearing was denied January 12, 1995, and appellant's petition for review by the Supreme Court was denied March 16, 1995.

---

[13]Because we agree with Allstate's contention that its conduct in this case did not amount to bad faith, we do not address the additional assignments of error which Allstate briefed on appeal.

[14]Plaintiff also appealed the judgment, citing as error the trial court's grant of nonsuit to Allstate on the issue of punitive damages, as well as the court's ruling denying plaintiff an award of interest on the stipulated judgment. Because we reverse the judgment, plaintiff's appeal is moot.